v. CHILDCRAFT Education Corporation, 2010-14-55. We'll hear from Mr. Carroll when you're ready. Yes, thank you. It's Carroll for Pellan Seat Sack Council. Your Honors, I don't want to make too complicated a case out of this. It's very simply a fact that my client... If it's not so, that might be the case, but I'll try not to anyway. The bottom line is that my client is a small family corporation operated by a young lady by the name of... That's not really the bottom line. That's the first line. That's the first line. The bottom line is that you're raising a number of issues, all of which seemingly have problems. Why don't you address the problems? All right. Instead of the background. The strongest issue here is that the trial judge had an emphasis as to whether or not there was a binding agreement or contract between the parties in deciding all the rest of the issues here. And what we are saying, and our strongest point was always, that even if the parties did not know each other and were not involved in any type of contractual arrangement or agreement, the fact of the matter is, and it's not disputed by Child Craft and School Specialty, that they started out in 2000. They established a website. They claim, which is a materialistic fact, they being Child Craft and School Specialty, claim that they set up a manufacturing of another product called Seat Pocket in 2003 because they claim that my client Seat Sack started to sell at a lower price of someone else. But what's the wrong of which your party complains that the district court decided against you? Our claim is that they took the name Seat Sack and they would not have taken it if they didn't have a good reputation and name. And they use Seat Sack as a search name or a dominion name to lure people and transfer it to their own website. What law did they violate? Was this a trademark problem? This is a, well our position, it's a 15 U.S.C. 1125 problem. Meaning? Meaning that they basically took the It is a trademark? It is a trademark. It's also a word. Did you have a registered trademark? It was registered. In fact, School Specialty and Child Craft had it in their calendar with TM on it all the time. They knew this before they ever got involved. Now you've confused me because as I've read the record, I don't find any evidence that there was no registered trademark. The record as I read it was that you applied for it and then withdrew that and you may have reapplied but no trademark registration has ever been issued. Am I mistaken? My understanding is that the trademark was used by someone else in the past. They abandoned it. Our client then renewed their efforts in 2000 for trademark designation and it's presently being fought by Child Craft and School Specialty for a final. Mr. Carroll, does your client have a registered trademark? Not a final note. Not a final. Okay, then you don't have a suit for breach of a regular infringement of a registered trademark. That's correct. Can we understand that? We're not talking about 1114. We're talking about 1125. Unfair competition. Yes, and we're talking about even a word or any type of a misleading act. What's the unfair competition? Well, what they did was... Your client sold materials, seats in an arm's-length transaction and the defendant sold them and paid the price. It was not a simple arm's-length transaction notwithstanding the court's decision. The fact of the matter is the sale encompassed an agreement by my client that future orders would go through the defendant or the appellees and that the reorders would go through them and that we would back off and not compete in those areas that they were in fact addressing through their sales and catalogs. Let's take what you say is your best point. That they used the seat sack name to lure people to their website where they offered both the seat pocket and the seat sack. Or just seat pocket, Your Honor. Pardon me? Or just seat pocket in the inventory of the seat sack, right? Their claim is in 2003 they set it up to sell seat pockets. They claim that... The website was offering both, right? In the beginning and also it was offering just seat pocket with the seat sack. Where's the evidence that they lured customers onto a website that only offered the seat pocket? Where is the evidence of that? Next to the appendix, Your Honor, there are several references and examples. One talks about both. No, no. I want a page. Yes. Where do I find that they lured people onto a website that only offered the seat pocket? I believe the first reference was I'm going to assume for the moment that there isn't such a reference. Okay? So the allegation is they lured them onto a site which offered both the seat pocket and the seat sack. Now I, you also say the seat sack was offered at a deliberately high price so that in effect no one would buy it. What's the evidence of that? It's the same evidence, Your Honor. What's the evidence that they, did they raise the price of the seat sack? If you looked at the... No, wait. Did they raise the price of the seat sack? Yes. During the time... From what to what? During the time that they compared to the seat pocket. During the time that they were selling their seat pocket. They did not tell my client that they were selling the seat pocket initially that was theirs. They in turn listed the seat sack at two to three dollars more in price than the seat pocket. So they used the search name seat sack. Had they raised the price of the seat sack? Well they established it. It's not a Russian... They didn't raise the price of the seat sack. Our wholesale price was never raised. No, I'm talking about the price they sold it at. Your theory is that they were selling the seat sack at an artificially high price so that no one would buy it. Compared to the seat pocket. Where's the evidence that they raised the price of the seat sack over the course of time here? They constantly did it up and down. They varied the price but always their price was higher than the seat sack. That was the issue. Rather than waste the court's time, I'll look through my, say, five minutes and I will get that information. But I am saying to the court, which I will show... But even if they did, why couldn't they sell either product, excuse me, at whatever price they want? Where was there an agreement to the contrary? Because they said we will act as your distributor. I'm sorry. The first notation in the appendix is 115, where they use seat sack as a search name and they sell seat pockets alone. The other reference... Essay 115? 115. And the second reference... We're on 115. If you look at the appendix 115 for the appellant, you'll see the quick search... Is this the essay or which appendix? The one attached to your brief? Yes. Appellant's appendix. If you look at 115 in the appendix, under child craft, you see the website? Yeah. If you looked at the quick search, it's seat sack. And then if you look at the product being sold, it's a seat pocket, which is the appellee's product, not ours. Now, they say they stopped this and they only had to get rid of a few items in 2003. But the only reason they stopped this conduct, which wound up in several million dollars worth of seat pockets being sold, was that when this action was pending before the Southern District of New York, the court, the magistrate at that point in time, directed that it should not be done any longer. And the defense consented to that and withdrew it. That's what they said from the application. But they continued to do this between 2003, up past 2007. And during those four years, they made several million dollars drawing people in using seat sack to sell seat pockets. Did you go back to the New York court and say, hey, you know, they're violating your order? I had asked for a preliminary injunction initially. Magistrate Eaton denied it and said that we should go forward. And the motions for summary judgment were made. And at that point in time, the appeal was taken. So, the point is, that's our strongest point. You can't use our name, seat sack, to sell seat pockets. Why not? Because under 1125, you said you can't even use a word. That, in fact, confuses someone as to... They used the name seat sack when they had seat sacks to sell. And after. Four years later. What you're claiming is that they continued to use the name seat sack when they were only selling seat pockets. That's correct, Your Honor. That's the essence of your claim. That's the essence of our claim. And made up several million dollars. And we made a few items. And we couldn't understand what was going on because they never told us. The only reason that there was a breakup was that we found out they were manufacturing, through investigation, through a Taiwan distributor, these seat pockets. And then we realized that they were being sold by the appellees through the use of seat sack's name. And they also called their product, when they did in the New York educational system, a seat sack EDCCU. So that's because the specs had called for a seat sack. So they were selling their seat pockets as a seat sack EDCCU. And that continued also up to 2007. So all of these issues of using the goodwill of the name seat sack, and under 1125, even a word, much less the seat sack symbol of the trademark, cannot be used for that purpose. It resulted in the sales of the seat pockets for several million dollars without any consideration by clients and put them out of the market. The point is not the higher price of the seat sack. What did the trial court say about all that? It said, continually through its decision, they didn't have a contract. And so therefore, really without a contract. Now what did it say about this issue, about using the seat sack name to sell the seat pocket only? It said basically that we had to show a secondary meaning, that it wasn't well known. But that's not the point 1125. 1125 says even a word used, not just a seat trademark, which we are saying it is, even a word can't be used for that purpose. So the strangest thing is that the appellees have said, oh, we didn't know about your claim of basically using that name for a search into our website. And now it's for the first time we're hearing about it. But if you look at all the reference that we made from the first letter that just Magistrate Eaton asked for when the case started off, throughout every affidavit submitted by the appellees, they talk about our use of seat sack. It was only to get rid of some products. Mr. Carroll, you've used most of your rebuttal time. Oh, I have. Would you like to save the rest? Yes, Your Honor. Thank you. May it please the Court. Thank you. Is there evidence that your client used the seat sack name to attract customers to a website that sold only the seat sack? No, Your Honor, there is not. So what about 115? Well, 115 shows a printout of a page with the seat pocket product on it and the word seat sack in the search term. Nobody knows whether that search was conducted under that term or whether that seat sack name was written in there and then the page printed out. We do acknowledge, however… We're on summary judgment, aren't we? We are, yes, Your Honor. So every inference has to be given to him? That's true, and we do acknowledge… So the inference is that we all know how this was done. Sure, fair enough. Let me address that. The website that we're talking about is Childcraft's website, Childcraft Education. It is not some website geared towards seat sack. Well, that may be, but don't you think there's a problem if you use somebody else's identifier to refer them to a page where you're selling a competing product? I had thought that one of the allegations was that the search name seat sack was used to attract to a website that sold both seat sack and seat pocket. I have difficulty in seeing what's wrong with that. But if you just use the seat sack name to attract them to a page that sells only the seat pocket, maybe that's a problem. Sure, Your Honor, and candidly, we acknowledge that when someone entered the word seat sack into the search function of the Childcraft website, they would retrieve information about the seat pocket, but also the seat sack. How do I know that? But this page doesn't show the seat sack, per se. It just shows the seat pocket, per se. Take a look at page 119 of the appendix, and there you see the results of a search that shows both products. Excuse me, I'm sorry, 120. You see a search term there, seat sacks, and you have both products. Wait a second. The fact that you can show a search where it led to both products doesn't mean that that was always true. It appears from 115 that it wasn't always true. There were some circumstances, at least some searches at some period of time, where seat sack led you only to seat pocket, right? At the time that we had seat sacks in inventory, the record evidence of the declarations from our personnel say that that is not true. Say that what is not true? That the search term seat sack would lead you to information about both products. They say that it would lead you to both products? Yes. Why does it say that? One moment, Your Honor. That seems to be countered by 115. Your Honor, 115 is a... It's evidence of record. It is evidence of record. It is evidence that was created by plaintiff seat sack in this case. And we don't know the circumstances or the timing in which it was created. And this is important because when this lawsuit was filed, seat sack, or excuse me, child craft learned of this issue for the first time. That its search protocols was seizing on the word seat and bringing up both products. Like you, Your Honor, we didn't think anything was wrong with that, but we had just been sued. You learned for the first time that apparently a search for seat sack brought up only one product. No, both products. Seat sack and... Well, how do I know that? I mean, 115 shows it bringing up only the one product. That is in the declarations of Ms. Murphy and Ms. Klinger. Ms. Klinger's declaration is on page 56 of the supplemental appendix. Take a look at 119 when you get through with what you're doing. Yes, 119, Your Honor, shows seat pockets under the keyword seat sack. But again, this is a... From the printout at the bottom of this page, this is March of 2007. Seat sack, or excuse me, child craft still had seat sacks in its inventory at that time. Where do you have a declaration that says we never used seat sack terminology to lead you only to seat pocket? Your Honor, it is Ms. Klinger's declaration beginning at page 56 of the supplemental appendix. Okay, where does she say that? What page? In paragraph 3 on page 56 of the appendix, she said, Until recently, if a visitor to child craft's website entered the search term seat sack, the website would produce information about both the seat sack product, which I understand to be made by plaintiff seat sack, and the seat pocket made by child craft. So, she doesn't say that there was never a time. No, she doesn't, Your Honor. Fair enough. You can't talk over me. I'm sorry. She does not say there was never a time when it wouldn't have led you only to seat pocket. Does somebody else say that? We have Ms. Murphy's declaration, which is found at page 182 of the supplemental appendix, but her declaration is very much of a piece with Ms. Klinger's. Here's the background. Child craft began manufacturing the seat pocket in 2003, and offered both products in its catalog and on its website from 2003 through 2005. After 2005, the seat sack product was no longer offered in its catalog. Don't you think that there could be an unfair competition claim if you use somebody's technology to lead you to another product on your website? But, Your Honor, it's not... I'm asking. Could that be a Lanhamac claim? It can be a Lanhamac claim, but it's not in this situation, and here's why. When someone goes to the website and puts in the word seat sack, it is not Child Craft who is using that term. The visitor of the website is using that term. It's their website, isn't it? That is true, but what happens is the search protocols on the website search for any common terms within Child Craft's suite of products. And when it sees the word seat, it directs you to seat pocket once... It directed you to both when both were offered for sale, and to seat pocket when seat pocket was offered for sale only. Once Child Craft became aware of this upon the filing of the lawsuit, it said, we will change it. That was not, emphatically not, at the order of the court. Child Craft made that change immediately once it read the allegations of seat sack's complaint. But even if, Your Honor, considers that to be a problem under the Lanham Act, you still have a gaping evidentiary hole here, and that is the absence of any evidence at all that anyone other than the plaintiff executed a search under the name seat sack. That anyone was deceived or likely to be deceived. But we have to give him that inference, don't we? I don't think you have to give him that inference, Your Honor. He's got an obligation to come forward with evidence of confusion or a likelihood of confusion, and there is no evidence that anyone other than the plaintiff ever made this search or even thought about making such a search on our website. It's not exactly strange that somebody might make such a search. Well, your guess is as good as mine, Your Honor. If someone, I suppose, was looking specifically for that product and didn't have other access to it, they might go to the websites of Childcraft or other educational supply providers and enter that search term. I just don't know. We don't know. There's nothing in the record on that issue. But there never was a trial on that issue, was there? There was not a trial on that issue. That's true. What did the trial judge say about this on summary judgment? How did he deal with this specific issue? He dealt with this issue in connection with the overall Lanham Act claims under Section 1125, which is to say he concluded correctly that the name Seatsack is not protectable, and even if it were protectable, there is no likelihood of confusion. Those holdings remain, and in our eyes, remain valid, even in connection with the search term issue on the website. He said, accordingly, plaintiff's evidence fails to show the first essential element under 15 U.S. Code 1125, namely a protectable trademark or trade dress. That's correct. But that really isn't the issue under part of 1125 we're talking about, is it? Well, Your Honor, I have to confess that there's been somewhat of a moving target as to what provisions of 1125 we're talking about in this case. But if we're dealing with, there's been an introduction now for the first time of an anti-cyberscrot squatting claim, which is never raised before. Don't go there. It's a different question. But the deceptive or false advertisement arm of 1125 still requires a showing of likelihood of confusion. In secondary meaning? Well, secondary meaning is part of that. I mean, the likelihood of confusion implicates the strength of the seat sack mark, and the mark has no strength at all. One reason why people might go to Childcraft's website and search for a seat sack is because plaintiff engaged in a marketing effort almost from the inception of its company to associate the seat sack name with Childcraft. Now, there's no evidence that anyone actually did such a thing, but it is important to keep in mind that on the record evidence, the seat sack name is far more associated with Childcraft than it is with Seat Sack Inc. as a source of the product. But the district court said no secondary meaning. That was its holding, right? It was, yes, and held that secondary meaning was necessary. Is that true under the provision that says imposing liability on any person who misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods? Is there some secondary meaning? No, Your Honor, but— I don't think secondary meaning has anything to do with it. No, but I don't think under the language that you just read that there is a misrepresentation about the nature, character, et cetera, of any goods when a search term on a website— It doesn't say ours is better because the other falls apart. I'm sorry? It didn't say our product is better because the seat sack falls apart. That's right. There's no disparagement of the seat sack. There's no false representation. Yeah, but I thought you agreed earlier that there could be a Lanham Act claim if you used one person's name to attract customers to your product. I said there could be a Lanham Act claim, but not in this situation. You mean because there's no secondary meaning attached to the name. That's right. In a situation where somebody uses the name Coca-Cola— What case says that there has to be secondary meaning under those circumstances? No, Your Honor, I'm just considering a situation where somebody uses a protectable mark, trade name, to draw people into a website, uses the name Coca-Cola, for example, to draw people into a website to make sales. There could be a Lanham Act violation. That's not our case here. That was all I was saying in response to your question. The district court said that plaintiff's mark is merely descriptive. That's correct, and it is merely descriptive. But that's for a trademark claim. This is not a trademark claim. Well, Your Honor— There is no trademark. This is a Lanham Act claim, and you can have false advertising without a protected trademark, right? You can, but I would submit to you that, again, CTAC has been something of a moving target in terms of the nature of their claim under Section 1125. They are claiming trademark infringement under 1125. Well, they maybe have a problem with that, but that's different from the Lanham Act. I agree, Your Honor, but I would also submit that they've got problems with a false advertising claim as well, in that there is, again, no evidence that anyone was deceived at all through the use of a search term by a visitor to Childcraft's website. No evidence of any intent to deceive. Thank you, Mr. Bache. I think the time has expired. Mr. Carroll has some rebuttal time. The first thing is that counsel seems to fail to realize that they say they stopped dealing with CTAC in 2003. They had some surplus. They had to get rid of it. We started this action in 2007. The websites were still being used. My client testified and submitted affidavits that the city of New York had contacted her. It then said that you're submitting when, in fact, I have it on 112, the appendix, search name CTAC, and then the product being CTAC, C-C-E-D-U, Corp., which is really seat pockets, being sold to the city of New York school systems. So that continued right up to 2007. But for Magistrate Eaton's help at a conference and the consent of counsel, the website would be continuing today. So I'm saying between 2003 and 2007, several million dollars were made by the appellees, and we had a few hundred dollars from the name. In addition, with respect to the 1125 claim, it indicates that it uses any word, term, name, symbol, or device, or any combination, et cetera, that cause confusion or cause a mistake or deceive the affiliation, connection, or association. You're saying you don't need a trademark or secondary meaning. That's correct, under that section. And in fact, I believe the case law, and I don't have the case in front of me, but I believe the case law said even the intent is not necessary to deceive, totally, because if the cause is a mistake and it was unintentional and the person who does it reaps the benefits of it, in essence, they open themselves up to the liability for their actions for four years. Do you have one final thought, Mr. Carroll? Before you give our final thought, I have a question. Yes, please. Clarification on page six of your blue brief, you say, in late 1999, Appley Childcraft Education Corporation, in association with the remaining appellees, entered into a partnership agreement with Appellate. You're not referring to an agreement different from the basic contract, are you? Is there some other agreement that's not in the record? Both are in the record. One page was an invoice being signed by my client. The second page talked about partnership agreement on the form submitted by the appellees. I'd have to find it there, but it's in the record. It's cited in my brief. We have them. And it talks about a partnership agreement, leading my client to believe that it's a partnership agreement. We're all working together, due diligence. You don't have the site to that at the moment, do you? Never mind. Just give us your... 178. Okay. And that's basically it. I'm asking this court to reverse and send back. Thank you, Mr. Carroll. Take the case under advisement.